1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   LONNIE DAVIS,                          CASE NO. C13-0895JLR

11                     Plaintiff,          ORDER GRANTING IN PART
                                           AND DENYING IN PART
12            v.                           DEFENDANTS' MOTION FOR
                                           SUMMARY JUDGMENT
13   CITY OF SEATTLE, et al.,

14                     Defendants.

15                        **I.  INTRODUCTION**

16            This matter comes before the court on a motion for summary judgment brought by

17   Defendants the City of Seattle ("the City") and Officer Elliot Easton.  (*See* Mot. (Dkt.

18   # 15).  This case arises out of Officer Easton's traffic stop of Plaintiff Lonnie Davis.

19   Having considered the submissions of the parties, the balance of the record, and the

20   relevant law, and no party having requested oral argument, the court GRANTS in part

21   and DENIES in part Defendants' motion.

22

ORDER- 1

1

**II.  BACKGROUND**

2      The following facts are undisputed.[1]  On January 12, 2013, Seattle police officers

3 Elliot Easton and Ryan Huteson were driving a patrol car in South Seattle, working a

4 shift on an "emphasis patrol."[2]  (Easton Decl. ¶ 2; Huteson Decl. (Dkt. # 17) ¶ 2.)  The

5 purpose of the emphasis patrol was to put additional patrol resources on the street during

6 weekends to proactively address alcohol-related crimes.  (*Id.*)  Shortly after midnight, the

7 officers observed Mr. Davis' vehicle driving in front of them.  (Easton Decl. ¶ 3; Huteson

8 Decl. ¶ 3; *see also* Davis Decl. ¶¶ 2-3; Video at 0:01.)

9      The in-car video shows Mr. Davis' car driving in the right-hand lane of a two-lane

10 road.  (*See* Video at 0:02)  Approaching a green stoplight, Mr. Davis first turned on his

11 left blinker and then his right blinker.  (*See id* at 0:42.)  Mr. Davis entered a dedicated,

12 right-hand turn yield lane and, although the light was still green, came almost to a

13 complete stop before proceeding slowly through the turn.  (*See id*.)  After completing the

14 turn, Mr. Davis' vehicle swerved from the left to the right side of the lane without

15 braking.  (*See id.* at 1:04.)  Shortly thereafter, Mr. Davis voluntarily pulled his car to the

16 side of the street and slowed to a stop.  (*See id.*)  At this point, Officer Easton activated

17

18
      [1] The court relies on the in-car video taken from the officer's police vehicle for the majority of
19 these facts.  (*See* Video (Dkt. # 16-1).)  The parties agree that the in-car video accurately sets forth the
   facts relevant to this motion.  (*See* Mot. at 8 n.1; Davis Decl. (Dkt. # 23) ¶ 5 ("I have looked at the car
20 police car [sic] recording . . . .  It shows exactly what happened when the police followed me and then
   parked behind me."); Easton Decl. (Dkt. # 16) ¶ 13.)  Even if they did not, the Supreme Court has held
21 that, if parties tell two different stories, one of which is contradicted by a video in the record, a court must
   view the facts in the light depicted by the video.  *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

22      [2] Mr. Davis did not file a claim against Officer Huteson.  (*See generally* Am.  Compl. (Dkt. # 11-
   1).)

ORDER- 2

1  the patrol car lights and pulled up behind Mr. Davis' stopped vehicle.  (*See id.*; *see also*

2  Easton Decl. ¶ 5.)

3      Officer Easton approached Mr. Davis on the driver's side of his car and began

4  talking to him.  (Video at 1:45.)  Officer Easton claims that Mr. Davis "was verbally

5  combative, raising his voice and demanding to know why he was pulled over."[3]  (Easton

6  Decl. ¶ 6.)  Mr. Davis admits that he was "certainly upset" and that he asked Officer

7  Easton:  "Why were you following me?"  (Davis Decl. ¶ 7.)  Mr. Davis did not alert the

8  officers to the fact that he was in possession of a firearm.  (*Id.*; Easton Decl. ¶ 6.)

9      Meanwhile, Officer Huteson, acting as "cover officer," approached Mr. Davis' car

10  on the passenger side, looking for potential threats.  (*See* Video at 1:50; Huteson Decl.

11  ¶ 5.)  Officer Huteson also "saw and heard that Mr. Davis was agitated."  (Huteson Decl.

12  ¶ 6.)  When Officer Huteson shined his flashlight into Mr. Davis' car, he spotted a semi-

13  automatic handgun partially concealed under the floormat by Mr. Davis' right foot.  (*Id.*

14  ¶ 6.)  A magazine was loaded into the gun.  (*Id.*)  Officer Huteson stepped away from the

15  vehicle, drew his own firearm, warned Officer Easton:  "Hey, gun.  There's a gun right

16  below him."  (Video at 2:05.)  Upon hearing the warning, Officer Easton looked up and,

17  seeing Officer Huteson's reaction, drew his handgun and pointed it towards Mr. Davis.

18  (*Id.* at 2:07.)  Officer Easton instructed Mr. Davis to put his hands on the steering wheel.

19  (*Id.* at 2:10.)  He continued pointing his firearm towards Mr. Davis while Officer Huteson

---

[3] Because only Officer Huteson's microphone was synchronized to the audio input of the in-car camera, the initial conversation between Officer Easton and Mr. Davis is inaudible on the video.  (*See* Video; Easton Decl. ¶ 6.)

ORDER- 3

1    radioed for another police unit to join as backup.  (*Id.* at 2:20.)  After requesting for

2    backup, Officer Huteson explained to Officer Easton that the gun was "shoved under the

3    floormat under his [Mr. Davis'] right leg."  (*Id.* at  2:52.)

4         Shortly thereafter, a second car drove slowly by the officers, turned around, and

5    pulled to a stop on the opposite side of the street.  (*Id.* at 3:35.)  Officer Huteson was

6    concerned that the occupants of that vehicle intended to intervene in the traffic stop.

7    (Huteson Decl. ¶ 8.)  After advising Officer Easton to continue watching Mr. Davis,

8    Officer Huteson crossed the street to confirm that the driver lived nearby.  (*See* Video at

9    3:42-50; Huteson Decl. ¶ 8.)  In the meantime, Officer Easton was not comfortable

10   asking Mr. Davis to exit the vehicle without backup because in order to exit Mr. Davis

11   would have to reach in the direction of his gun to undo his seatbelt.  (Easton Decl. ¶ 8.)

12        Upon returning to Mr. Davis' vehicle, Officer Huteson explained to Mr. Davis that

13   "We're just waiting for one other officer, okay?  For one other officer to get here, so we

14   can do it safely."  (Video at 4:50.)  Officer Huteson continued:  "I saw the gun.  I know

15   it's there, so we'll deal with it in a second."  (*Id.* at 4:54.)  Mr. Davis replied:  "Saw what

16   gun?"  (*Id.* at 4:59)  Officer Huteson clarified:  "The gun that's under your floormat, next

17   to your right leg."  (*Id.* at 5:00.)  Mr. Davis then admitted:  "That's my gun.  I got it for

18   me."  (*Id.* at 5:05)  He continued arguing as Officer Huteson turned away.  (*Id.* at 5:25.)

19        A few seconds later, Officer Huteson explained to Mr. Davis:  "I'm going to reach

20   in and undo you seatbelt for you, okay, and I'm just gonna have you step out.  Is that fair

21   enough?"  (*Id.* at 5:30.)  He opened Mr. Davis' door and explained, in response to Mr.

22   Davis' questions:  "No, I'm not gonna even grab the gun.  I'm just gonna take your

1    seatbelt off.  I'm just going to have you step out, just so I know that everything's cool and

2    you're away from the gun." (*Id.* at 5:40.)  As soon as Officer Huteson unfastened Mr.

3    Davis seatbelt and Mr. Davis exited the vehicle, Officer Easton holstered his gun. (*Id.* at

4    6:00; Easton Decl. ¶ 9.)

5         Officer Easton patted Mr. Davis down. (Video at 6:04.)  Mr. Davis handed his

6    license and concealed weapons permit to Officer Easton, who checked the documents in

7    the patrol car's computer system. (*Id.* at 7:30.)  A few minutes later, a backup patrol car

8    arrived. (*Id.* at 8:30.)  Mr. Davis continued arguing with the officers throughout the

9    remainder of the traffic stop. (*Id.* at 6:04-9:00.)  Officer Huteson warned that, in the

10   future, Mr. Davis should alert police that he had a concealed handgun in his car. (*Id.* at

11   10:30.)  At that point, Mr. Davis accused the officers of pulling him over because he is an

12   African-American. (*Id.* at 10:45.)  After Officer Easton returned and confirmed that Mr.

13   Davis' documents were in order, the officers left the scene, and Mr. Davis was free to

14   leave. (*Id.* at 12:03.)

15        As a result of this traffic stop, Plaintiff now brings claims against the City of

16   Seattle and Officer Easton under 28 U.S.C. § 1983 for unreasonable seizure and

17   excessive force in violation of the Fourth Amendment and for selective enforcement in

18   violation of the Equal Protection Clause. (*See generally* Compl. (Dkt. # 1).)  In addition,

19   Plaintiff brings state law claims for assault, false arrest, and negligence. (*See generally*

20   *id.*)  Each claim is discussed in turn below.

21   //

22

ORDER- 5

1                                          **III.  ANALYSIS**

2    **A.**    **Summary Judgment Standard**

3           Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

4    where the moving party demonstrates (1) the absence of a genuine issue of material fact

5    and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

6    317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

7    moving party bears the initial burden of production of showing an absence of a genuine

8    issue of material fact.  *Celotex*, 477 U.S. at 323.

9           If the moving party does not bear the ultimate burden of persuasion at trial, it can

10   show an absence of issue of material fact in two ways: (1) by producing evidence

11   negating an essential element of the nonmoving party's case, or, (2) showing that the

12   nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

13   *Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  The

14   burden then shifts to the non-moving party to designate specific facts from which a

15   factfinder could reasonably find in the non-moving party's favor.  *Celotex*, 477 U.S. at

16   324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In determining whether

17   the factfinder could reasonably find in the non-moving party's favor, "the court must

18   draw all reasonable inferences in favor of the nonmoving party, and it may not make

19   credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing*

20   *Prods., Inc.*, 530 U.S. 133, 150 (2000).

21   *//*

22

ORDER- 6

1 **B.** **Qualified Immunity**

2    In the context of 28 § 1983 claims, "[t]he doctrine of qualified immunity protects

3 government officials 'from liability for civil damages insofar as their conduct does not

4 violate clearly established statutory or constitutional rights of which a reasonable person

5 would have known.'" *Stanton v. Sims,* 571 U.S. ----, 134 S.Ct. 3, 4-5 (2013) (per curiam)

6 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Qualified immunity gives

7 government officials breathing room to make reasonable but mistaken judgments," and

8 "protects all but the plainly incompetent or those who knowingly violate the law."

9 *Ashcroft v. al-Kidd*, 563 U.S. ----, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*,

10 475 U.S. 335, 341 (1986)).  Accordingly, an officer will be denied qualified immunity in

11 a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party

12 asserting injury, show that the officer's conduct violated a constitutional right, and (2) the

13 right at issue was clearly established at the time of the incident such that a reasonable

14 officer would have understood her conduct to be unlawful in that situation."  *Green v.*

15 *City & Cnty. of San Fran.*, ----F.3d.----, 2014 WL 1876273, at *11 (9th Cir. May 12,

16 2014).

17    Regarding the second prong, the plaintiff bears the "burden of demonstrating that

18 the right allegedly violated was clearly established at the time of the incident."  *Greene v.*

19 *Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009).  A government official's conduct violates

20 clearly established law when, "at the time of the challenged conduct, the contours of a

21 right are sufficiently clear that every reasonable official would have understood that what

22 he is doing violates that right."  *al-Kidd*, 131 S. Ct. at 2083.  This determination "must be

ORDER- 7

1  undertaken in light of the specific context of the case, not as a broad general proposition."

2  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In the absence of genuine issues of material

3  fact, this determination is a question of law to be determined by the court.  *Green*, 2014

4  WL 1876273, at *11 (citing  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.

5  1993)).

6  **C.   Unreasonable Seizure**

7         Mr. Davis claims that the officers' initial traffic stop was an unreasonable seizure

8  in violation of the Fourth Amendment.  Police stops fall into three categories.  *Morgan v.*

9  *Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993).  First, a police officer may stop a person

10  for questioning so long as the person is free to leave at any time.  *Id.*  Second, a police

11  officer may "seize" a person for a brief, investigatory stop.  *Id.*; *see Terry v. Ohio*, 392

12  U.S. 1, 16 (1968).  Such stops must be supported by a "reasonable suspicion to believe

13  that criminal activity may be afoot."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

14  Finally, the police may make a full-scale arrest, which must be supported by probable

15  cause.  *Morgan*, 997 F.2d at 1252 (citing *Adams v. Williams*, 407 U.S. 143, 148-49

16  (1972)).

17         Under settled Fourth Amendment law, a traffic stop constitutes a seizure, and

18  therefore an officer must have reasonable suspicion before detaining a motorist.

19  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 946 (9th Cir. 2003) (citing *Wren v.*

20  *United States*, 517 U.S. 806, 809-10 (1996)).  Reasonable suspicion exists when an

21  officer is aware of "specific, articulable facts which, together with objective and

22  reasonable inferences, form the basis for suspecting that the particular person detained is

1  engaged in criminal activity." *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011).

2  This standard takes into account "the totality of the circumstances—the whole picture."

3  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014).

4        Whether an investigatory stop is supported by reasonable suspicion presents a

5  mixed question of law and fact. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1140 (9th

6  Cir. 2002).  Only when the material, historical facts are not in dispute is the existence of

7  reasonable suspicion a question of law for the court to decide.  *See Tsao v. Desert Palace,*

8  *Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012); *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-

9  80 (9th Cir. 2003).

10        Defendants contend that the traffic stop was constitutional because the officers had

11  a reasonable suspicion that Mr. Davis was driving under the influence of alcohol in

12  violation of RCW 46.61.502.[4]  (Mot. at 6-7; *see also* Easton Decl. ¶ 5 ("We suspected the

13  driver might be intoxicated.").)  Determining reasonable suspicion is a "commonsense

14  approach" under which courts can appropriately recognize certain driving behaviors, such

15  as weaving, as "sound indicia of drunk driving."  *Navarette*, 134 S. Ct. at 1690-91

16  (compiling cases discussing "weaving" in the context of driving under the influence).

17  The Ninth Circuit has held that merely weaving within a lane does not justify a traffic

18  stop unless the weaving is "pronounced" or occurs for a "substantial distance."  *See*

19  *United States v. Colin*, 314 F.3d 439, 445 (9th Cir. 2002) (finding no reasonable

20  _____

21      [4] Mr. Davis contends that the officers pulled him over due to his race.  (*See* Davis Decl. ¶ 8.)
Even if this accusation were true, however, "[s]ubjective intentions play no role in ordinary, probable-

22  cause Fourth Amendment analysis."  *United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005).

1   suspicion where driver drifted along, but did not cross, the right and left fog lines for

2   about 10 seconds each).  However, weaving in conjunction with other indicia of

3   intoxication can give rise to a reasonable suspicion that a driver is under the influence.

4   *See United States v. Mesa*, 234 F. App'x 680, 682-83 (9th Cir. 2007) (finding that a

5   traffic stop was reasonable when an officer observed a vehicle swerving, braking

6   repeatedly as it swerved, and turning left through a yellow light); *United States v.*

7   *Fernandez-Castillo*, 324 F.3d 1114, 1120 (9th Cir. 2003) (finding that a traffic stop was

8   reasonable when a citizen's report of erratic driving was corroborated by an officer's

9   observations that the vehicle was drifting across its lane and the driver was sitting

10   abnormally close to the steering wheel).

11       Here, the parties dispute whether the officers observed Mr. Davis' vehicle

12   swerving before the officers activated the in-car video.  (*Compare* Easton Decl. ¶ 3

13   (explaining that the officers did not activate the in-car video until after they noticed Mr.

14   Davis swerving) *and* Huteson Decl. ¶ 3 *with* Davis Decl. ¶ 4 ("I did not do any swerving

15   while I was driving.").  The court, in determining summary judgment, must take the facts

16   in the light most favorable to Mr. Davis.  *See Reeves*, 530 U.S. at 150.  Accordingly, for

17   purposes of this motion, the court relies only on the behavior captured by the officers' in-

18   car video system.  *See Scott*, 550 U.S. at 380-81.

19       The in-car video shows Mr. Davis briefly activating the wrong turn signal, pulling

20   abnormally slowly through a right turn on a green light, and swerving before parking on

21   the side of a residential street.  (*See* Video at 0:40.)  The court notes that the swerve could

22   be viewed as consistent with the actions of a driver attempting to find an appropriate

ORDER- 10

1    place to pull over and then changing her mind.  Overall, the court finds that these facts,

2    without more, do not form adequate grounds for a reasonable suspicion that Mr. Davis

3    was driving under the influence.  *See Colin*, 314 F.3d at 446 ("If failure to follow a

4    perfect vector down the highway or keeping one's eyes on the road were sufficient

5    reasons to suspect a person of driving while impaired, a substantial portion of the public

6    would be subject each day to an invasion of their privacy.").

7         If, however, the officers had observed Mr. Davis' vehicle swerving before they

8    activated the in-car camera, it is possible that reasonable suspicion might attach.  *See,*

9    *e.g.*, *United States v. Ioannidis*, No. C-08-00539 MAG, 2008 WL 5273732, at *2  (N.D.

10   Cal. Dec. 19, 2008) (finding reasonable suspicion where the suspect "drifted outside of

11   his driving lane [and into the bike lane] three times over the course of one minute without

12   signaling").  Consequently, the extent to which, if any, the officers observed Mr. Davis'

13   vehicle swerving before they activated the in-car camera is a material dispute of fact that

14   precludes summary judgment on this issue.  *See Celotex*, 477 U.S. at 323.

15        Nonetheless, turning to the qualified immunity inquiry, the court finds that Mr.

16   Davis has not carried his burden to demonstrate that the right allegedly violated was

17   clearly established at the time of his traffic stop.  *See Greene*, 588 F.3d at 1031.  The

18   Ninth Circuit precedent of *Mesa* and *Fernandez-Castillo* make clear that a combination

19   of minor driving irregularities that do not themselves constitute illegal activity can

20   nonetheless sum to a reasonable suspicion of intoxicated driving.  *See Mesa*, 234 F.

21   App'x at 682-83; *Fernandez-Castillo*, 324 F.3d at 1120 (9th Cir. 2003) ("All relevant

22   factors must be considered in the reasonable suspicion calculus—even those factors that,

1   in a different context, might be entirely innocuous.")  Although the court ultimately

2   concludes that Mr. Davis' driving irregularities do not quite rise to that level, the court

3   cannot say that "every reasonable official" in Officer Easton's position would have

4   understood that the traffic stop violated Mr. Davis' Fourth Amendment rights.  *See al-*

5   *Kidd*, 131 S. Ct. at 2083.  After all, the "level of suspicion the standard requires is

6   considerably less than . . . a preponderance of the evidence."  *Navarette*, 134 S. Ct. at

7   1687 (internal quotations omitted).  And, just as in *Mesa* and *Fernandez-Castillo*, the

8   officers observed behavior that common sense indicates might be caused by driving

9   under the influence.  The doctrine of qualified immunity "provides ample protection to all

10  but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*,

11  475 U.S. 335, 341 (1986).  As the in-car video shows, Officer Easton fits neither

12  category.  Consequently, he is entitled to qualified immunity with respect to Mr. Davis'

13  unreasonable seizure claim.

14  **D.**   **Excessive Force**

15         Mr. Davis claims that Officer Easton used excessive force in violation of the

16  Fourth Amendment when he pointed his handgun at Mr. Davis.  In evaluating a Fourth

17  Amendment claim of excessive force, courts ask "whether the officers' actions are

18  'objectively reasonable' in light of the facts and circumstances confronting them."

19  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing

20  of the nature and quality of the intrusion on the individual's Fourth Amendment interests

21  against the countervailing governmental interests at stake."  *Id.* at 396.  "The calculus of

22  reasonableness must embody allowance for the fact that police officers are often forced to

1   make split-second judgments—in circumstances that are tense, uncertain, and rapidly

2   evolving—about the amount of force that is necessary in a particular situation." *Id.* at

3   396-97.  As such, reasonableness is evaluated "from the perspective of a reasonable

4   officer on the scene, rather than with the 20/20 vision of hindsight." *Glenn v.*

5   *Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 397).

6   Police officers "need not avail themselves of the least intrusive means of responding";

7   rather, they need only act "within that range of conduct [identified] as reasonable."

8   *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002).

9        The excessive force analysis involves three steps.  First, a court must "assess the

10   severity of the intrusion on the individual's Fourth Amendment rights by evaluating the

11   type and amount of force inflicted." *Glenn*, 673 F.3d at 871.  Second, a court must

12   "evaluate the government's interest in the use of force." *Id.*  At a minimum, three factors

13   inform the government's interest:  "(1) how severe the crime at issue is, (2) whether the

14   suspect posed an immediate threat to the safety of the officers or others, and (3) whether

15   the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lal v.*

16   *California*, 746 F.3d 1112, 1117 (9th Cir. 2014).  Of these, the most important is whether

17   the suspect posed an immediate threat to the safety of the officers or others. *Id.*; *see also*

18   *Glenn*, 673 F.3d at 872.  Finally, a court must "balance the gravity of the intrusion on the

19   individual against the government's need for that intrusion." *Id.*

20        In the context of an officer drawing his or her weapon, the Ninth Circuit has held

21   that pointing a gun at a suspect who is known to be unarmed, is behaving peacefully, and

22   is only suspected of a misdemeanor constitutes an excessive use of force. *See, e.g.*,

ORDER- 13

1   *Sandoval v. Las Vegas Metro. Police Dep't*, No. 12-15654, 2014 WL 2936254, at *8 (9th

2   Cir. July 1, 2014) (denying qualified immunity to officers who pointed guns at unarmed,

3   compliant teenage boys whom the officers mistook for burglars); *Tekle v. United States*,

4   511 F.3d 839, 845-46 (9th Cir. 2007) (finding that pointing guns for ten to fifteen minutes

5   at an eleven-year-old boy who cooperated with officers' instructions constituted

6   excessive force); *Motley v. Parks*, 383 F.3d 1058, 1071-72 (9th Cir. 2004) (denying

7   qualified immunity because "no reasonable officer could have believed that pointing a

8   gun at a child, particularly a five-week-old baby, was reasonable during the course of a

9   non-exigent . . . search"); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002)

10  (finding that pointing a gun at a suspect was excessive force when "[t]he crime under

11  investigation was at most a misdemeanor; the suspect was apparently unarmed and

12  approaching the officers in a peaceful way").

13          On the other side of the spectrum, the Ninth Circuit has held that pointing a gun at

14  a suspect does not constitute an excessive use of force when the officer reasonably fears

15  for his or her safety—such as when the suspect is potentially armed, is not fully

16  cooperative, has created a dangerous situation, or is suspected of a serious crime.  *See,*

17  *e.g.*, *Deskins v. City of Bremerton*, 388 F. App'x 750, 752 (9th Cir. 2010) (affirming

18  finding of no excessive force when an officer pointed her gun at a driver because she

19  "could reasonably fear for her safety as she was alone with [the suspect] on a dark

20  highway with little traffic; he failed to remain in his vehicle, despite [the officer's]

21  instructions; his behavior from the initial encounter on was unusual; he was much larger

22  than [the officer]; and she did not know whether [the suspect] was armed or not");

1   *Anderson v. City of Bainbridge Island*, 472 F. App'x 538, 539 (9th Cir. 2012) (affirming

2   finding of no excessive force when police officers pointed weapons at driver suspected of

3   speeding who, after attempting to evade the police, exited his car with his hands in the

4   air, because the driver "was not innocent" or "non-threatening"); *see also Hinz v. City of*

5   *Everett*, No. C10-0347-JCC, 2010 WL 3212001 (W.D. Wash. Aug. 10, 2010) (finding no

6   excessive force when an officer investigating an assault pulled his gun on a suspect

7   sitting in a lawn chair because the officer had a reasonable suspicion that the suspect was

8   armed and was unable to see whether the suspect had a weapon within reach).

9          The question of whether or not an officer's actions were objectively reasonable

10  under the Fourth Amendment is a "pure question of law," not a question of fact reserved

11  for a jury.  *Scott*, 550 U.S. at 381 n.8; *see also Gonzalez v. City of Anaheim*, 747 F.3d

12  789, 801 (9th Cir. 2014) (J. Trott, Kozinski, Tallman, and Bea, *dissenting*).  Because the

13  excessive force inquiry ordinarily "requires a jury to sift through disputed factual

14  contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that

15  "summary judgment . . . in excessive force cases should be granted sparingly."  *Smith v.*

16  *City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005) (en banc).  However, the Supreme Court

17  has made clear that, at the summary judgment stage, once a court has determined the

18  relevant set of facts and drawn all inferences in favor of the nonmoving party, the

19  reasonableness of an officer's actions remains question of law for the court to decide.

20  *Scott*, 550 U.S. at 381 n.8.

21         With this caselaw as a guide, and viewing any disputed facts in the light most

22  favorable to Mr. Davis, the court now turns to the *Graham* inquiry.  With respect to the

1    first consideration—the amount of force used—in general, "pointing a loaded gun at a

2    suspect . . . is use of a high level of force." *Espinosa v. City & Cnty. of San Francisco*,

3    598 F.3d 528, 537 (9th Cir. 2010).  Here, Officer Easton trained his gun at Mr. Davis for

4    a little less than four minutes.  (*See* Video at 2:07.)  A delay of one minute, however, was

5    due to Officer Huteson's investigation of the suspicious car that had driven past, turned

6    around turn, and parked nearby.  (*See* Video at 3:35; Huteson Decl.¶ 8.)  Moreover,

7    although the officers originally intended to wait for backup to arrive, when it became

8    apparent that Mr. Davis would cooperate, Officer Huteson helped Mr. Davis exit the car.

9    (*See* Video at 4:50.)  As soon as Mr. Davis was safely out of reach of the gun, Officer

10   Easton holstered his gun.  (*See* Video at 6:00; Easton Decl. ¶ 9.)  Therefore, the duration

11   of the use of force was temporary, and only as long as reasonably necessary to ensure the

12   officers' safety.

13          With respect to the second consideration—the government's interest in the use of

14   force— Mr. Davis was suspected of the gross misdemeanor of driving under the

15   influence and the misdemeanor of unlawfully carrying a concealed weapon, and he was

16   not actively resisting or attempting to evade the police.  *See* RCW 46.61.502; 9.41.050;

17   (*see generally* Video).  The crux of this consideration is whether the situation posed an

18   immediate threat to the safety of the officers.  *Lal*, 746 F.3d at 1117; *Glenn*, 673 F.3d at

19   872.  In determining whether a suspect posed an immediate threat, courts "adopt the

20   perspective of a reasonable officer on the scene in light of the facts and circumstances

21   confronting her." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)

22   (internal punctuation omitted).  Here, the officers knew that Mr. Davis was armed with a

handgun; the handgun was partially concealed; the handgun was loaded; and the handgun was within Mr. Davis' easy reach.[5]  (*See* Video 2:00-5:00; Huteson Decl. ¶ 6-7; Easton Decl. ¶ 6-7.)  Moreover, Mr. Davis had not alerted the police to the presence of the firearm, and later appeared to deny possessing the firearm.  (*See* Video at 4:59 (Mr. Davis asking, "Saw what gun?").)  On top of that, the traffic stop occurred late at night, Mr. Davis was "certainly upset" and agitated at being pulled over, and he argued with the officers.  (*See* Davis Decl. ¶ 7; Huteson Decl. ¶ 6; *see generally* Video.)  An officer faced with these circumstances would have reasonably concluded that he faced an immediate threat to his safety.[6]  *See Torres*, 648 F.3d at 1124; *see also Michigan v. Long*, 463 U.S. 1032, 1047 (1983) ("[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers."); *United States v. Salas*, 879 F.2d 530,

_____

[5] Although Officer Easton, who walked up to the driver's side window, did not personally observe Mr. Davis' gun, he was alerted to its presence by Officer Huteson, who declared "Hey, gun. There's a gun right below him." (Video at 2:05).  "[L]aw enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers."  *Green*, 751 F.3d at 1045 (quoting *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005); *see also United States v. Jensen*, 425 F.3d 698, 705 (9th Cir. 2005).

[6] Mr. Davis does not dispute any of these facts.  (*See generally* Resp. (Dkt. # 22); Davis Decl. ¶ 6.)  He does dispute the officers' claim that he was being "uncooperative," and so, for the purposes of this motion the court accepts his version of the facts.  (Davis. Decl. ¶ 7.)  Mr. Davis also emphasizes that he did not try to draw his weapon, and that his weapon was holstered.  (*Id.* ¶ 9.)  He admits, however, that the Officers could not have known that his weapon was holstered.  (Davis Dep. (Dkt. # 18-1) at 21.)  The court declines to require officers to face a brandished weapon before they can reasonably ascertain a threat to their safety.  *See, e.g.*, *Gonzalez*, 747 F.3d at 800 ("The word 'threat' denotes an *indication* of *impending* danger or harm.  The law does not require an officer who immediately faces physical harm to wait before defending himself until the indication of impending harm ripens into the onslaught of actual physical injury."); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.")  Finally, although both officers testified that they drew their weapons because they feared for their safety, Mr. Davis believes that the officers drew their weapons due to Mr. Davis' race.  (Davis. Decl. ¶ 8; Easton Decl. ¶ 7; Huteson Decl. ¶ 7.)  However, even assuming that were true, an "officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force."  *Graham*, 490 U.S. at 397.

1   535 (9th Cir. 1989) ("A weapon can be concealed under the seat of a vehicle.  It is readily

2   accessible to be used to harm any police officer who approaches an automobile especially

3   at 10:30 p.m., when a hand movement to a weapon may be masked by the night's

4   shadows.")

5         Finally, balancing the gravity of the intrusion against the government's need for

6   that intrusion, the court concludes that Officer Easton's conduct was objectively

7   reasonable in light of the facts and circumstances confronting him.  *See Graham*, 490

8   U.S. at 397.  The Ninth Circuit has consistently found that, although pointing a weapon at

9   a harmless individual constitutes excessive force, drawing a weapon in response to a

10   reasonable fear for an officer's safety does not—even if it is unclear whether the suspect

11   is armed.  *See, e.g.*, *Deskins*, 388 F. App'x at 752 (officer did not know whether driver

12   was armed but the night was dark and he was behaving strangely); *Anderson*, 472 F.

13   App'x at 539 (fleeing suspect was wearing only T-shirt and jeans and had his hands in the

14   air, but officers could have suspected he was armed).  Here, Mr. Davis admits he

15   possessed a concealed, loaded, handgun within easy reach.  (Davis Decl. ¶ 6.)

16   Additionally, from the officers' perspectives, he was upset, possibly intoxicated,

17   argumentative, and initially attempted to deny that he possessed a gun.  (*See* Video 2:00-

18   5:00; Huteson Decl. ¶ 6-7; Easton Decl. ¶ 6-7.)  Although Mr. Davis argues that he had

19   only good intentions, the "calculus of reasonableness must embody allowance for the fact

20   that police officers are often forced to make split-second judgments—in circumstances

21   that are tense, uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396-97.  For that

22   reason, reasonableness is judged "from the perspective of a reasonable officer on the

1    scene, rather than with the 20/20 vision of hindsight." *Glenn*, 673 F.3d at 871.  Because

2    reasonable officers would have ascertained an immediate threat to their safety in light of

3    the facts available, and because the officers' use of force lasted only as long as

4    reasonably necessary to de-escalate the situation, there was no constitutional violation.

5    *See Lal*, 746 F.3d at 1117 .

6        Moreover, even if Officer Easton's actions did constitute excessive force, he is

7    entitled to qualified immunity.  Regarding the second prong of qualified immunity, Mr.

8    Davis has not borne his burden to demonstrate that the right allegedly violated was

9    clearly established.  *See Greene*, 588 F.3d at 1031.  In light of *Deskins*, *Anderson*, and

10   *Hinz*, the court cannot say that "every reasonable official" in Officer Easton's position

11   would have understood that drawing his weapon violated Mr. Davis' Fourth Amendment

12   rights.  *See al-Kidd*, 131 S. Ct. at 2083.  After all, police officers "need not avail

13   themselves of the least intrusive means of responding," as long as their conduct falls

14   within range identified as "reasonable."  *Billington*, 292 F.3d at 1188.  And even if Mr.

15   Davis did not pose an immediate threat to the officers' safety, a reasonable officer could

16   have thought that he did.  *See Lal*, 746 F.3d at 1117.  For this reason, also, summary

17   judgment is appropriate with respect to Mr. Davis' excessive force claims.

18   **E.    Equal Protection**

19       To state a § 1983 claim for selective enforcement in violation of the Equal

20   Protection Clause, Mr. Davis must show that Officer Easton's conduct had both a

21   discriminatory effect and was motivated by a discriminatory purpose.  *See Rosenbaum v.*

22   *City & County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007); *Thornton v. City*

1  *of St. Helens,* 425 F.3d 1158, 1166-67 (9th Cir. 2005) ("To state a § 1983 claim for

2  violation of the Equal Protection clause, a plaintiff must show that he was treated in a

3  manner inconsistent with others similarly situated, and the defendants acted with an

4  intent or purpose to discriminate against the plaintiff based upon membership in a

5  protected class.")  Therefore, to survive summary judgment, Mr. Davis must present

6  sufficient evidence to raise genuine triable issues of fact both as to whether the officers'

7  decisions to single out Mr. Davis for a traffic stop and reactions to his concealed handgun

8  were racially motivated (discriminatory intent) and whether others in a similar situation

9  are generally treated differently (discriminatory effect).  *See Lacey v. Maricopa County,*

10  693 F.3d 896, 920–922 (9th Cir. 2012).

11      Mr. Davis provides zero evidence regarding discriminatory effect.  The only

12  evidence Mr. Davis has supplied at all is his own declaration; this declaration does not

13  address discriminatory effect.  (*See generally* Dkt.; Davis Decl.)  Moreover, in his

14  deposition, Mr. Davis was unable to identify any other instances of people who were

15  engaged in similar conduct but were treated differently than he was by the Seattle police.

16  (*See* Davis Dep. at 21-22.)

17      Mr. Davis also provides insufficient evidence regarding discriminatory intent.  Mr.

18  Davis avers in his declaration that "I believe the police pulled guns on me, [sic] because I

19  was an African-American driving a Cadillac in an African-American neighborhood late

20  at night.") (Davis. Decl. ¶ 8.)  But Mr. Davis' subjective, personal belief, alone and

21  unsubstantiated by other evidence, is not enough to create a genuine issue of material

22  fact.  The parties dispute whether the officers were aware of Mr. Davis' race prior to the

ORDER- 20

traffic stop.  (*Compare* Easton Decl. ¶ 11 (testifying that he did not know Mr. Davis' race until he rolled down his window) *and* (Huteson Decl. ¶ 11) (same) *with* (Davis Dep. at 17-19) (claiming that the officers could have determined his race by entering his license plate number in their in-car computer system).)  Regardless, there is no evidence in the record that the traffic stop or the officers' subsequent conduct was motivated by Mr. Davis' race.  Officer Easton's report, which he typed into the patrol car's computer system after the traffic stop, makes no mention of Mr. Davis' race.  (*See* Easton Decl. Ex. B.)  Additionally, Mr. Davis admits—and the video tape confirms—that the officers never made any comments or references regarding his race during the traffic stop.  (Davis Dep. at 19.)  In fact, Mr. Davis testified that, after he exited the car, the officers "were acting normal" and "weren't hostile or anything."  (*Id.*)

Because the record is devoid of evidence showing discriminatory intent or effect based on Mr. Davis' race, summary judgment on Mr. Davis' equal protection claim is appropriate.  *See Thomas v. Marion Cnty. Or. Circuit Court*, No. CIV. 10-1090-BR, 2010 WL 5067913, at *3-4 (D. Or. Dec. 6, 2010) (dismissing equal protection claim predicated on traffic stop because the plaintiff "ha[d] not alleged facts showing intentional discrimination or differential treatment of others similarly situated"); *Hassan v. Weidenfeld*, No. C11-2026-JCC, 2013 WL 4094838, at *8-9 (W.D. Wash. Aug. 13, 2013) (granting summary judgment against equal protection claim predicated on an arrest because the plaintiff provided no evidence showing discriminatory purpose or effect).

//

1  **F.   *Monell* Claim**

2   "[A] municipality cannot be held liable under § 1983 on a *respondeat superior*

3  theory." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).

4  Instead, the City of Seattle may be liable for Officer Easton's allegedly unconstitutional

5  conduct only if Mr. Davis demonstrates an injury resulting from the "execution of a

6  government's policy or custom." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900

7  (9th Cir. 2008).  To establish a § 1983 claim, Mr. Davis must prove:  (1) that he

8  possessed a constitutional right of which he was deprived; (2) that the City had a custom

9  or policy; (3) that the City's custom or policy amounts to deliberate indifference to his

10  constitutional rights; and (4) that the custom or policy was the moving force behind the

11  violation of his constitutional rights.  *See id.* (internal citations omitted); *accord Gibson*

12  *v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86, 1193-94 (9th Cir. 2002) (citing *Monell*, 436

13  U.S. at 694).

14   "Like individual state officials, municipalities are only liable under Section 1983 if

15  there is, at minimum, an underlying constitutional tort." *Johnson v. City of Seattle*, 474

16  F.3d 634, 638-39 (9th Cir. 2007).  Because, as discussed above, Mr. Davis has proved

17  unable to substantiate his claims for excessive force and selective enforcement, Mr.

18  Davis' *Monell* claims against the City based on those alleged constitutional violations

19  necessarily fail.  *Id.*

20   Turning to the unreasonable seizure claim, Mr. Davis provides no evidence

21  regarding a relevant custom or policy held by the City.  "[P]roof of random acts or

22  isolated events" does not rise to the level of custom or policy; only a "permanent and

1   well-settled" practice leads to municipal liability.  *Thompson v. City of L.A.*, 885 F.2d

2   1439, 1443-44 (9th Cir. 1989).  The only incident Mr. Davis discusses is his own, and

3   this incident alone does not constitute a City custom or policy.  *See City of Oklahoma*

4   *City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

5          Mr. Davis suggests that the court look to the declaration of Sergeant Thomas

6   Ovens, filed in support of the Defendants, for a description of the requisite custom or

7   policy.  (Resp. at 14-15.)  Mr. Ovens' declaration explains why, in his expert opinion, the

8   actions of Officers Easton and Huteson were reasonable and constitutional.  (*See*

9   *generally* Ovens Decl. (Dkt. # 20).)  The court is unable to identify how any official City

10  policy allegedly disclosed in this declaration amounts to "deliberate indifference" to Mr.

11  Davis constitutional rights.  *See Dietrich,* 548 F.3d at 900.  Because Mr. Davis has put

12  forth no evidence supporting the requisite element of a precipitating, underlying City

13  policy, summary judgment on Mr. Davis' *Monell* claim against the City is appropriate.

14  **G.     False Arrest**

15         **1.  State qualified immunity**

16         Under Washington law, an officer has qualified immunity from suit for false arrest

17  where the officer "(1) carries out a statutory duty, (2) according to procedures dictated to

18  him by statute and superiors, and (3) acts reasonably."  *Staats v. Brown*, 991 P.2d 615

19  (Wash. 2000).  Those three requirements are met in the present case.  First, police

20  officers in general act under statutory authority to enforce the state criminal laws.  *See*

21  RCW 10.93.070; *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000);

22  *Goldsmith v. Snohomish Cnty.*, 558 F. Supp. 2d 1140, 1155-56 (W.D. Wash. 2008).

1    Second, Sergeant Ovens, who supervises instructors in the advanced training unit of the

2    Seattle Police Department, testifies that Officer Easton's actions were consistent with the

3    training and guidelines employed by the Seattle Police Department.  (*See generally*

4    Ovens Decl.); *McKinney*, 13 P.3d at 641; *Goldsmith*, 558 F. Supp. 2d at 1155-56.  Third,

5    as discussed above, a reasonable officer could have believed that he had reasonable

6    suspicion to initiate a traffic stop of Mr. Davis, and the officers' use of force was not

7    excessive.  *See* Sections III.C, D.   Therefore, Officer Easton is entitled to state law

8    qualified immunity with respect to the false arrest claim.  *See Luchtel v. Hagemann*, 623

9    F.3d 975, 984 (9th Cir. 2010) (concluding that the officers were entitled to state law

10   qualified immunity because "the officers were properly carrying out a statutory duty

11   according to the procedures dictated by Washington law and police training, and . . . the

12   officers acted reasonably.")

13          However, a determination that the individual officer has qualified personal

14   immunity does not necessarily resolve the question on the part of the employing

15   governmental agency.  Although the Washington Supreme Court at one time permitted

16   the qualified immunity of police officers to extend to claims against the state based on

17   respondeat superior, *Guffey v. State*, 690 P.2d 1163 (Wash. 1984), that ruling has since

18   been called into question.  Specifically, in *Babcock v. State*, the Washington Supreme

19   Court emphasized that the immunities of state officers do not shield the governmental

20   agency that employs them from tort liability, even when liability is predicated upon

21   respondeat superior.  809 P.2d 143, 156 (Wash. 1991).  Later, in *Savage v. State*, the

22   Washington Supreme Court held that personal qualified immunity of parole officers does

ORDER- 24

1    not extend to the State.  899 P.2d 1270, 1274-75 (Wash. 1996) (criticizing *Guffey*).  This

2    holding also applies to municipalities.  *Hertog, ex rel. S.A.H. v. City of Seattle*, 979 P.2d

3    400, 407-08 (Wash. 1999).  Since then, courts have recognized that *Savage* has impliedly

4    overruled *Guffey*.  *See, e.g.*, *Haugen v. Fields*, No. CV-05-3109-RHW, 2007 WL

5    1526366, at * (E.D. Wash. May 23, 2007) (finding that a municipality could be held

6    liable under a theory of respondeat superior for the actions of its police officers).

7    Therefore, it appears that Officer Easton's personal qualified immunity does not extend

8    to the City.  Accordingly, the court turns to the merits of the false arrest claim.

9        **2.  Elements of false arrest**

10       Under Washington law, false arrest is "the unlawful violation of a person's right of

11   personal liberty or the restraint of that person without legal authority."  *Bender v. City of*

12   *Seattle*, 664 P.2d 492, 499 (Wash. 1983).  If an officer's actions are authorized under law,

13   the false arrest claim must fail.  *Id.*; *see also Goldsmith v. Snohomish Cnty.*, 558 F. Supp.

14   2d 1140, 1156 (W.D. Wash. 2008) ("Because the restraint was lawful, Plaintiff's claims

15   for false arrest and imprisonment fail.")  As such, "probable cause is a complete defense

16   to an action for false arrest."  *Hanson v. City of Snohomish*, 852 P.2d 295, 301 (Wash.

17   1993).  Similarly, in the context of investigatory stops, a plaintiff cannot establish a claim

18   for false arrest if an officer's actions are supported by reasonable suspicion (and therefore

19   are reasonable under *Terry*).  *McKinney*, 13 P.3d at 641 ("[T]he Appellants have not

20   established an action for false arrest because the officers' actions were reasonable under

21   *Terry* and therefore authorized.")  Because the court has already found that there are

22   material issues of fact as to whether the officers' traffic stop was supported by reasonable

1   suspicion,[7] summary judgment on Mr. Davis' false arrest claim with respect to the City is

2   inappropriate.[8]

3   ──────────────────

4   [7] Mr. Davis contends that his traffic stop was an arrest that needed to be justified by probable cause. (*See* Resp. at 13.) This assertion is incorrect. "There is no bright-line rule to determine when an

5   investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Rather, courts consider the "totality of the circumstances," evaluating both the "intrusiveness of the stop" as well as "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear

6   for his safety to warrant the intrusiveness of the action taken." *Id.* "The relevant inquiry is always one of reasonableness under the circumstances." *Id.*

7   Here, the facts underlying the inquiry were captured by the in-car video and are therefore undisputed. To begin, the duration of the investigatory stop was reasonable. The cases "impose no rigid

8   time limitation on *Terry* stops." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The critical inquiry is whether "the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the suspect." *Gallegos v. City of*

9   *Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (upholding detention that lasted 45 minutes). Here, the traffic stop lasted only twelve minutes. (*See* Video.) Weapons were drawn for only four minutes. (*See*

10   *id.*) As discussed above, there was a brief delay to wait for backup and to investigate a suspicious nearby vehicle. *See* Section III.D. Otherwise, the officers acted diligently to ascertain whether Mr. Davis was intoxicated and whether he possessed a concealed weapons permit. (*See* Video; Easton Decl. ¶ 10

11   ("During the course of interacting with Mr. Davis, I realized he was not intoxicated. . . . For that reason, we did not perform any field sobriety tests."); Huteson Decl. ¶ 10.) As soon as the officers determined

12   that Mr. Davis was not impaired or unlawfully carrying a concealed weapon, he was free to leave. (*See* Video.) As such, the duration of the stop was reasonable.

13   Moreover, the scope of the investigatory stop was also reasonable. A *Terry* stop does not automatically transform into an arrest once a firearm is drawn. *See United States v. Alvarez*, 899 F.2d

14   833, 838 (9th Cir. 1990). Rather, courts evaluate the totality of the situation, including whether "1) the suspect is uncooperative . . . ; 2) the police have information that the suspect is currently armed; 3) the stop closely follows a violent crime; and 4) the police have information that a crime that may involve

15   violence is about to occur." *Washington*, 98 F.3d at 1189. Here, the officers knew that Mr. Davis was armed with a loaded firearm. As discussed above, in light of the circumstances, the officers had a

16   sufficient basis to fear for their safety. *See* Section III.D. The intrusiveness of the search was reasonably necessary to resolve this fear. The officers initially drew their weapons, but once it was clear that Mr. Davis was compliant, they merely required him to step out of the car and away from the gun before

17   retrieving his license; they did not handcuff him, make him lie on the ground, place him in the patrol car, or otherwise restrict his liberty. *See, e.g.*, *Gallegos*, 308 F.3d at 992 (finding that an investigatory stop

18   was not converted to an arrest even though the suspect was ordered from his truck at gunpoint, handcuffed, put in the back of a patrol car, and detained for forty-five minutes). For these reasons, Mr.

19   Davis' traffic stop remained an investigatory *Terry* stop, not an arrest. Accordingly, the applicable standard is reasonable suspicion.[7] *Morgan*, 997 F.2d at 1252.

20   [8] Defendants argue that, because Mr. Davis' detention does not rise to the level of an arrest as the term is defined for purposes of the Fourth Amendment, he cannot maintain a claim for false arrest under

21   state law. (Reply (Dkt. # 24) at 11.) Washington courts, however, have evaluated false arrest claims in the context of investigatory stops under *Terry*. *See, e.g.*, *McKinney*, 13 P.3d at 641. Additionally, the

22   Washington State cause of action for false arrest is not limited to arrests by police officers, but rather applies to any "violation of a person's right of personal liberty or . . . restraint of that person." *See*

**H.     Assault**

"Generally, a police officer making an arrest is justified in using sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest." *Boyles v. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991). "An assault is any act of such a nature that causes apprehension of a battery." *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000). A battery is "a harmful or offensive contact with a person." *Id.*

Because the court already found that Officer Easton's use of force was reaosnable, his assault claim is precluded under *Boyles*. *See Boyles*, 813 P.2d at 179; *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (2000) ("Furthermore, because we found that the officers' use of force was reasonable, the assault and battery claims against the Respondents fail because the touching was lawful."); *Goldsmith v. Snohomish Cnty.*, 558 F. Supp. 2d 1140, 1156 (W.D. Wash. 2008) (holding, after deciding that defendants' use of force was not excessive under the Fourth Amendment, that "because the touching was lawful and therefore privileged, Plaintiff's claim for assault and battery is without merit"). Accordingly, summary judgment is appropriate as to Mr. Davis' assault claims.

**I.     Negligence**

Under Washington's public duty doctrine, "no liability may be imposed for a public official's negligent conduct unless it is shown that the duty breached was owed to

---

*Bender*, 664 P.2d at 499. As such, the court declines to adopt Defendants' proposed limitation regarding that cause of action.

1    the injured person as an individual and was not merely the breach of an obligation owed

2    to the public in general." *Cummins v. Lewis Cnty.*, 133 P.3d 458, 461 (Wash. 2006).  As

3    such, a government official will be held to owe a duty to a plaintiff only if one of four

4    exceptions applies:  "(1) legislative intent, (2) failure to enforce, (3) the rescue doctrine,

5    [or] (4) a special relationship."  *Id.*

6           Here, Mr. Davis has made no argument, and set forth no evidence, showing that

7    any one of these four exceptions applies to his situation.  Because there is no evidence

8    that one of these exceptions applies, it cannot be said that the officers owed Mr. Davis as

9    an individual a specific duty.  Accordingly, summary judgment is appropriate as to Mr.

10   Davis' negligence claims.  *See Pearson v. Davis*, No. C06-5444RBL, 2007 WL 3051250,

11   at *4 (W.D. Wash. Oct. 17, 2007) (granting summary judgment against plaintiff on

12   negligence claim because government official owed plaintiff no specific duty); *Rengo v.*

13   *Cobane*, No. C12-298TSZ, 2013 WL 3294300, at *2-4 (W.D. Wash. June 28, 2013)

14   (same).

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

ORDER- 28

1

## IV.  CONCLUSION

2          For the foregoing reasons, the court GRANTS in part and DENIES in part

3    Defendants' motion for summary judgment (Dkt. # 15).  Specifically, the court dismisses

4    all of Mr. Davis' claims except his false arrest claim against the City.

5          Dated this 31st day of July, 2014.

6

7                                              _____

8                                              JAMES L. ROBART
                                               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 29